**DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA  and | ) | |
| PEOPLE OF THE VIRGIN ISLANDS | ) | |
| | ) | |
| v. | ) | Criminal Action No. 2017-0038-01 |
| | ) | |
| LUIS DAVIS, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

**Attorneys:**
**Daniel H. Huston, Esq.**
St. Croix, U.S.V.I.
　　*For the Government*

**Kia D. Sears, Esq.**
St. Thomas, U.S.V.I.
　　*For Defendant Luis Davis*

<u>**MEMORANDUM OPINION**</u>

**Lewis, Chief Judge**

THIS MATTER comes before the Court on Defendant Luis Davis' ("Defendant" or "Davis") Motion to Suppress Evidence and Statements ("Motion to Suppress" or "Motion") (Dkt. No. 41); the Government's Opposition thereto ("Opposition") (Dkt. No. 43); the evidence and arguments presented at the suppression hearing; and the supplemental briefing submitted by the parties following the suppression hearing (Dkt. Nos. 113; 114; 115; 116). For the reasons that follow, the Court will deny the Motion to Suppress.

## I.　　BACKGROUND

On December 12, 2017, the Government filed an eleven-count Indictment against Defendant and two codefendants—Chriss Cepeda ("Cepeda") and Joel Rivera ("Rivera")—

charging a series of crimes including burglary, home invasion, carjacking, assault, kidnapping, and robbery. (Dkt. No. 1).[1]

On October 15, 2018, Defendant filed the instant Motion to Suppress. At the subsequent suppression hearing, the Government presented the testimony of Customs and Border Protection ("CBP") Officer Kai Joseph ("Officer Joseph"), Virgin Islands Police Department ("VIPD") Officer Emmanuel Morales ("Officer Morales"); and VIPD Detective Ellery Quailey ("Det. Quailey"). The Government also submitted several exhibits. The following evidence emerged from the suppression hearing.[2]

## A. Suppression Hearing Evidence

Officer Joseph testified that in September 2017, he was employed by the VIPD as a detective in the Criminal Investigations Bureau. (Hr'g Tr. 5). He testified that at 1:55 a.m. on September 10, 2017, he was patrolling with his partner, Officer Cedano,[3] when they were notified

---

[1] Specifically, Davis is charged with using a firearm during a violent crime in violation of 18 U.S.C. §§ 2(a) and 924(c)(1)(A)(ii) (Count I); burglary in the first degree in violation of 14 V.I.C. §§ 11(a) and 442(3) (Count II); home invasion in violation of 14 V.I.C. § 11(a), 475(a)(3), and 476(b) (Count III); assault in the first degree in violation of 14 V.I.C. §§ 11(a) and 295(3) (Count IV); carjacking in violation of 18 U.S.C. §§ 2(a) and 2119(1) (Count V); two counts of kidnapping in violation of 14 V.I.C. §§ 11(a) and 1051 (Counts VI and VII); robbery in the first degree in violation of 14 V.I.C. §§ 11(a) and 1862(2) (Count VIII); two counts of unauthorized possession of a firearm in violation of 14 V.I.C. §§ 11(a) and 2253(a) (Counts IX and X); and felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count XI). The Indictment was initially sealed and was unsealed on September 18, 2018 following Defendants' arrests. (Dkt. No. 5).

[2] The Court bases the background factual discussion in this section on the record established at the suppression hearing. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

[3] Officer Cedano is not identified by his first name in the suppression hearing testimony and is referred to as "Officer Cedano," "Detective Cedano," and "Cedano." *See, e.g.*, Hr'g Tr. 20, 42.

over the radio that a home invasion and theft had occurred in Estate Rust-Up-Twist. *Id.* at 6-8. According to the report, three individuals broke into the home of Stephen O'Dea ("O'Dea") and stole O'Dea's vehicle. *Id.* at 6, 8, 37. The alleged perpetrators were described as "three black male individuals" who were "w[earing] masks" and "black clothing" and "were armed." *Id.* at 9, 47. The suspect description given by the 911 dispatcher was: "three black males, one slender, one 5/7, another possibly 5/11." *Id.* at 38. The stolen vehicle was described as a yellow Jeep Wrangler with a soft top and a cracked windshield. *Id.* at 9.

Officer Joseph testified that, upon receiving the call, he and his partner proceeded towards Estate Rust-Up Twist. He further testified that, while en route, a patrol officer reported over the radio that the officer had observed a yellow Jeep with a soft top and damaged windshield at the In and Out Service Station in Estate Glynn. *Id.* at 9-11. Officers Joseph and Cedano traveled to the In and Out Service Station, where they observed a yellow Jeep facing towards the street with the headlights on and the engine running. *Id.* at 12. Officer Joseph testified that he and his partner drove into the gas station, confirmed that the yellow Jeep matched the description given over the radio, and went to the door of the service station, which was locked. *Id.* They did not observe anyone inside the yellow Jeep or in the area. *Id.* Officers Joseph and Cedano spoke with the gas station attendant who unlocked the door and let them in. *Id.*

The officers observed two males near the freezer inside the In and Out Service Station. *Id.* at 13. Officer Joseph asked the two males if they owned the Jeep Wrangler and they stated they did not. *Id.* Then, Officer Cedano spoke to the two individuals while Officer Joseph spoke to the gas station attendant. *Id.*

Officer Joseph testified that the gas station attendant told him that three men wearing black clothing had come into the In and Out Service Station. *Id.* Two men entered the service station

first, and a third man wearing a backpack followed shortly. *Id.* The gas station attendant further stated that when the officers arrived, the men noticed the police vehicle and started to walk around. *Id.* at 13-14. He also stated that the men "seemed worried" or "nervous" as law enforcement arrived at the In and Out Service Station, and that one man took the backpack off the freezer and went into the restroom. *Id.* at 13-14, 45-46.

Officer Joseph testified that upon hearing about the individual in the restroom, he called for additional police assistance. *Id.* at 14. VIPD Officer Emmanuel Morales ("Officer Morales") arrived on the scene in response to a radio transmission regarding a home invasion and vehicle theft and observed the Jeep Wrangler. *Id.* 59-60. He spoke with Officer Cedano and then joined Officer Joseph. *Id.* at 14, 59-60. Officer Joseph informed Officer Morales that there was an individual in the restroom and the officers approached the restroom. *Id.* at 15, 60.

Officer Joseph knocked on the door of the restroom, identified himself as a police officer, and instructed whoever was in the restroom to come out. *Id.* at 15, 60. An adult male—later identified as Davis—exited the restroom. *Id.* Officer Morales patted down Davis' person for officer safety and Officer Joseph asked Davis if he operated the vehicle outside of the service station, to which he responded no. *Id.* at 15-16, 61-62. Officer Joseph searched the restroom and discovered a backpack. *Id.* at 17, 49. Officer Joseph asked Davis "if the [backpack] was his" and Davis "stated that no, it wasn't his." *Id.* at 17-18. Officer Joseph conducted an initial search of the backpack which revealed the butt of a gun. *Id.* at 49. Officer Joseph said "gun" to inform Officer Morales that "he found a weapon inside, inside the backpack." *Id.* at 63. At that point, Officer Joseph called a forensics unit. *Id.* at 49. Officer Morales took Davis outside. *Id.* at 50. Officer Morales testified that the entire interaction with Defendant took approximately two minutes. *Id.* at 63.

Officer Joseph testified that the three suspects at the service station met the description given over the radio of the alleged perpetrators because "[t]hey were wearing dark clothing, … approximately they were the same height that was given"[4] and they were "Hispanic males/black males." *Id.* at 19.

Davis and the other two men—later identified as Cepeda and Rivera—were handcuffed and transported by police vehicle to the Police Operations Building for questioning. *Id.* Officer Joseph testified that Davis was handcuffed at some point between approximately 2:53 a.m., after the gun was found in the backpack, and approximately 3:20 a.m., before the individuals were transported to the police station. *Id.* at 17-18, 50, 55-56.

Officer Joseph testified that at the Police Operations Building, he and Detective Sergeant Frankie Ortiz ("Sgt. Ortiz") brought Davis into a room to be interviewed approximately four hours after transport. *Id.* at 56-57. The interview, which was conducted by Officer Joseph and Sgt. Ortiz, was video recorded. *Id.* at 20; *see also* Gov't Ex. 1.  Officer Joseph advised Defendant of his *Miranda* rights from a form. (Hr'g Tr. at 21); Gov't Ex. 1 at 00:50-2:15. Officer Joseph gave Defendant a copy of that form—the "Warning and Consent to Speak" form—and asked if he could read and understand English. Gov't Ex. 1 at 00:50-00:55; Gov't Ex. 2. Davis responded that he could. Gov't Ex. 1 at 00:56. Officer Joseph read the "Advise of Rights" portion of the Warning and Consent to Speak form to Defendant and asked him if he understood, and if he did to sign the document. *Id.* at 00:57-01:25.[5] Davis said that he understood and signed the Advise of Rights

---

[4] In his police report, Officer Joseph indicated that the height of one of the suspects was from "5/3 to 5/6," and the height of the other two were from "5/9 to 6~feet." *Id.* at 39.

[5] The "Advise of Rights" portion of the form states:

You must understand your rights before we ask you any questions.

portion of the form acknowledging that he had been read his *Miranda* rights. Gov't Ex. 1 at 01:26-02:15; *see also* Gov't Ex. 2. Officer Joseph also read the waiver portion of the form to Defendant and asked "Okay?" to which Davis responded with a nod. Gov't Ex. 1 at 02:17-02:37.[6] After Officer Joseph directed Defendant where to sign, Defendant refused to sign the waiver portion, stating that he had no questions and nothing to say. *Id.* at 02:41-02:45; *see also* Gov't Ex. 2. The officers then asked Davis a series of questions to which he responded in a recorded interview. *See* Gov't Ex. 1 at 02:51-09:10.

Officer Joseph testified that Defendant did not request a lawyer at any time. (Hr'g Tr. at 24); *see generally* Gov't Ex. 1. Officer Joseph further testified that the two other individuals who were transported to the Police Operations Building were also interviewed. *Id.* at 56. He testified

---

You have the right to remain silent.

Anything you say can be used against you in court, or other proceedings.

You have the right to talk to a lawyer for advice before we question you and to have him with you during questioning.

If you cannot afford a lawyer and want one, a lawyer will be appointed for you by the court. If you decide to answer questions now without a lawyer present, you will still have the right to stop the questioning at any time. You also have the right to stop the questioning at any time until you talk to a lawyer.

I have read this statement of my rights and it has been read to me, and I understand what my rights are.

Gov't Ex. 2.

[6] The waiver portion of the form states:

I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or force of any kin[d] has been used against me. I hereby voluntarily and intentionally waive my rights and I am willing to make a statement and answer questions.

Gov't Ex. 2.

that Cepeda was asked about the home invasion and Cepeda stated that the three individuals were involved; that both he and Davis held guns during the home invasion; and that the three individuals took the yellow Jeep Wrangler. *Id.* at 33-34.

Det. Quailey testified that he placed the three individuals under arrest following the interviews. *Id.* at 73-74. He further testified that during the post-arrest booking process, police officers took photographs of Davis and collected his DNA. *Id.* at 74.

### B. Written Submissions

In support of his Motion to Suppress, Davis argues that VIPD officers lacked the necessary reasonable suspicion or probable cause to seize him as he exited the In and Out Service Station restroom. (Dkt. Nos. 41 at 4-7; 114 at 1-6). According to Defendant, it was necessary for the Government to establish that a crime had been committed, and no testimony was given regarding any officer's "personal knowledge of the report that led to the home invasion radio broadcast." (Dkt. No. 114 at 3). Defendant also argues that there was only a broad description given of the individuals who committed the crime and the three codefendants did not match that description. *Id.* at 4-6. Further, Defendant argues that he did not abandon his backpack, and, because the Government did not establish probable cause to search it, the backpack and its contents must be suppressed. *Id.* at 10; Dkt. No. 116 at 2-3. Defendant also maintains that the Government failed to establish the probable cause needed for the transportation of Defendant to the police station. *Id.* at 6-8. Finally, Defendant argues that any statements made by Defendant are inadmissible because he did not receive *Miranda* warnings when he exited the restroom, nor did he waive his rights at the police station. Dkt. Nos. 114 at 11-13; 116 at 4-6. Davis contends that Officer Joseph and Sgt. Ortiz violated his *Miranda* rights by continuing to question him at the Police Operations Building after he refused to waive his *Miranda* rights, and that the statements Davis subsequently provided

7

were given involuntarily. Dkt. No. 114 at 9-11. Davis requests that all physical evidence and statements obtained from him be suppressed as fruits of his alleged illegal seizure and arrest. (Dkt. No. 41 at 7-8).[7]

In opposing the Motion, the Government argues that police officers had the necessary reasonable suspicion to perform a *Terry* stop on Defendant in their initial encounter.  (Dkt. Nos. 43 at 7; 113 at 1-7). While the Government concedes that Defendant was subject to a *de facto* arrest "after his interaction with the officers by the service station restroom" (Dkt. No. 113  at 7), the Government maintains that there was probable cause to detain and arrest Defendant "after VIPD completed its initial investigation." (Dkt. No. 43 at 5-6).  Further, the Government contends that because Defendant "physically and verbally abandoned" his backpack (Dkt. No. 113 at 9), he has no standing to challenge its recovery and search of its contents. (Dkt. No. 115 at 1-4). The Government further contends that Defendant waived his rights by signing a *Miranda* form acknowledging that he understood his rights and never invoking his right to remain silent either verbally or by remaining silent. (Dkt. Nos. 43 at 8; 113 at 10; 115 at 6-7). Finally, the Government maintains that Defendant's statement was not involuntary in that police did not use coercion or "improper tactics." Dkt. No. 43 at 8. For all of these reasons, the Government argues that the Motion should be denied.

---

[7] According to Davis, the physical evidence includes: (1) the contents of the backpack—including a Glock 22 firearm, a Glock 26 firearm, three magazines, ammunition and a gun holster; (2) DNA swabs taken in connection with the backpack and its contents; (3) buccal swabs taken from Davis; (4) clothing taken from Davis; and (5) photographs taken of Davis. (Dkt. No. 41 at 1).

## II.    APPLICABLE LEGAL PRINCIPLES

### A. Fourth Amendment Seizures

The Fourth Amendment to the United States Constitution protects individuals from, *inter alia*, unreasonable seizures. U.S. CONST. amend IV. A person is seized for Fourth Amendment purposes when either (1) "an officer applies physical force" to restrain the person's movement; or (2) the person "submits to an officer's show of authority." *United States v. Hester*, 910 F.3d 78, 84 (3d Cir. 2018) (quoting *California v. Hodari D.*, 499 U.S. 621, 625 (1991)); *see also United States v. Lowe*, 791 F.3d 424, 430 (3d Cir. 2015) ("A seizure occurs when there is either (a) a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful, or (b) submission to a show of authority.") (quotation and internal quotation marks omitted).

"Generally, a seizure is reasonable only where it is justified by a warrant or probable cause." *Couden v. Duffy*, 446 F.3d 483, 494 (3d Cir. 2006) (citation omitted). Probable cause to arrest requires more than mere suspicion of criminal activity. *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995). It does not, however, "require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt." *Id.* at 483 (citing *United States v. Glasser,* 750 F.2d 1197, 1205 (3d Cir. 1984). "Rather, probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Id.* (citations omitted).

Despite the general requirement of probable cause for a seizure, the Supreme Court established in *Terry v. Ohio*, 392 U.S. 1 (1968), that an officer lacking a warrant or probable cause may conduct what is commonly referred to as a "*Terry* stop"—"a 'brief, investigatory stop when

the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *Hester*, 910 F.3d at 84 (quoting *Illinois v. Wardlow,* 528 U.S. 119, 123 (2000)). The *Terry* analysis also applies in circumstances where the crime at issue has already been completed. *United States v. Brown*, 448 F.3d 239, 244 n.7 (3d Cir. 2006) (citing *United States v. Hensley*, 469 U.S. 221, 229 (1985) ("[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion.")). While a *Terry* stop constitutes a "seizure" and as such is subject to Fourth Amendment protection, *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003), the "intermediate level of intrusion" involved in a *Terry* stop—as opposed to the more serious level of intrusion involved in a full-blown arrest—justifies "allowing police to conduct a limited investigation into the possibility of criminal activity based on reasonable suspicion 'even though there is no probable cause to make an arrest.'" *George v. Rehiel*, 738 F.3d 562, 583 (3d Cir. 2013) (quoting *Adams v. Williams,* 407 U.S. 143, 145-46 (1972)).

In determining the legality of an alleged *Terry* stop, courts determine "whether the officer's action was justified at its inception"—that is, whether the stop was supported by reasonable suspicion at the outset. *Terry*, 392 U.S. at 20. It is well established that "[r]easonable suspicion is a less demanding standard than probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990). Because "probable cause means a fair probability that contraband or evidence of a crime will be found, the level of suspicion necessary to justify a Terry stop is somewhat lower and can be established with information that is different in quantity or content from that required for probable cause." *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006) (quoting *White,* 496 U.S. at 330).

"A reasonable suspicion of criminal activity may be formed by observing exclusively legal activity." *United States v. Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000). However, the police officer

must demonstrate that the stop was based on something more than an "inchoate and unparticularized suspicion or hunch." *Sokolow*, 490 U.S. at 7 (quoting *Terry*, 392 U.S. at 27) (internal quotation marks omitted). "Reasonable suspicion is an 'elusive concept,' but it unequivocally means that 'the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Brown*, 448 F.3d 239, 246 (3d Cir. 2006) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). In evaluating reasonable suspicion, courts "must consider 'the totality of the circumstances—the whole picture.'" *Sokolow*, 490 U.S. at 8 (quoting *Cortez*, 449 U.S. at 417).

In effectuating a *Terry* stop, police cannot "seek to verify their suspicions by means that approach the conditions of arrest." *Florida v. Royer*, 460 U.S. 491, 499 (1983). In other words, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* at 500. "The brief investigative stop allowed under *Terry*, is just that; a brief stop to allow police to investigate. The initial stop does not justify an arrest, prolonged detention, or a stop that lasts any longer than is reasonably necessary to investigate." *United States v. Bey*, 911 F.3d 139, 146-47 (3d Cir. 2018)

During a *Terry* stop, a "'person may be briefly detained against his will while pertinent questions are directed to him.'" *Kolender v. Lawson*, 461 U.S. 352, 364 (1983) (quoting *Terry*, 392 at 34) (White, J., concurring). Officers "may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). These questions may be asked in a manner that is "calculated to obtain an answer ... [b]ut they may not compel an answer." *Kolender*,

461 U.S. at 366 (Brennan, J., concurring). The subject of a *Terry* stop does not need to "answer any question put to him; indeed, he may decline to listen to the questions at all ... ." *Royer*, 460 U.S. 491, 498 (1983). A valid *Terry* stop does not implicate Defendant's Fifth Amendment rights. *See Maryland v. Shatzer,* 559 U.S. 98, 113 (2010); *see also United States v. Clark*, No. CR 2018-0009, 2019 WL 3456813, at *14 (D.V.I. July 30, 2019).

If an officer conducts an alleged *Terry* stop that is unsupported by a reasonable, articulable suspicion that the detained individual is involved in criminal activity, evidence obtained as a result of the stop is subject to suppression as "fruit of the poisonous tree." *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) (quoting *Wong Sun v. United States,* 371 U.S. 471, 487-88 (1963)). Further, the circumstances of a particular investigatory detention may transform an otherwise-valid *Terry* stop supported by reasonable suspicion into a full-blown arrest, which must be supported by probable cause. *United States v. Johnson*, 592 F.3d 442, 448 (3d Cir. 2010) (citations omitted). On the other hand, information obtained by law enforcement during a valid *Terry* stop may, in turn, permit the reasonable suspicion supporting the brief investigatory detention to "blossom into probable cause for arrest." *United States v. Navedo*, 694 F.3d 463, 470 (3d Cir. 2012).

### B.  *Miranda* Rights

The Fifth Amendment to the United States Constitution provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. The "procedural safeguards"—commonly known as

*Miranda* warnings—require that a suspect be advised prior to questioning that:

> [H]e has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Alston v. Redman*, 34 F.3d 1237, 1242 (3d Cir. 1994) (quoting *Miranda*, 384 U.S. at 479).

An individual may waive his *Miranda* rights "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444. To determine whether an individual's waiver of *Miranda* rights was valid, courts must ask (1) whether it was voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception," and (2) whether it was "made with full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Velasquez*, 885 F.2d 1076, 1084 (3d Cir.1989) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

"Once a defendant challenges the admissibility of any statements made while in custody, the government must prove [by a preponderance of the evidence] that the defendant was advised of and understood [his] Miranda rights and that he . . . validly waived those rights." *United States v. Briscoe*, 69 F.Supp.2d 738, 741 (D.V.I. 1999), *aff'd in part, rev'd in part on other grounds*, 234 F.3d 1266 (3d Cir. 2000); *see also Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986). "A necessary predicate to a finding of involuntariness is coercive police activity," and "there must be some causal connection between the police conduct and the confession." *Id.* (citing *Connelly*, 479 U.S. at 167.)

### III.    DISCUSSION

#### A.  Fourth Amendment

Defendant's argument with respect to the alleged Fourth Amendment violations is threefold. First, Defendant argues that VIPD officers lacked the necessary reasonable suspicion to support a *Terry* stop after he exited the In and Out Service Station restroom. (Dkt. No. 114 at 1-6). Second, Defendant contends that he did not abandon his backpack and thus there was no basis for the officers to search it. *Id.* at 10. Third, Defendant asserts that the officers lacked probable cause to uphold either the initial seizure or the resulting *de facto* arrest when he was transported from the service station to the police station. *Id.* at 6-8. Defendant argues that, as a result, all of his statements and the evidence that the officers discovered must be suppressed. *Id.*

The Government counters that it has established that Defendant was subject to a valid *Terry* stop outside of the In and Out Service Station restroom. (Dkt. No. 113 at 2-4). The Government further argues that because Defendant abandoned his backpack, the search was permissible. Finally, while the Government concedes that, "after [Defendant's] initial interaction with the officers by the service station restroom," Defendant was subjected to a *de facto* arrest, *id.* at 7, the Government maintains that the officers had the requisite probable cause for an arrest.

#### 1.  *Terry* Stop

The Court finds that Defendant was subject to a valid *Terry* stop when he exited the restroom at the In and Out Service Station because the officers had a reasonable, articulable suspicion—based on the reports over the police radio, the account of the gas station attendant, and their own observations—that Defendant had engaged in criminal activity. Specifically, at the suppression hearing, the officers testified to the call from the dispatcher and the investigation when they arrived at the In and Out Service Station to establish that law enforcement had a reasonable,

14

articulable suspicion that Davis had been involved in the reported home invasion and theft of a vehicle.

In assessing the legitimacy of a *Terry* stop, the Court must first determine "whether the officer's action was justified at its inception"—that is, whether the *Terry* stop was supported by reasonable suspicion at the outset. *Terry*, 392 U.S. at 20. The Court considers the totality of the circumstances to assess whether officers had reasonable suspicion. *Bey*, 911 F.3d at 145 (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Courts must "credit reasonable deductions drawn by police in light of their experience and training." *Id.* (citing *Arvizu*, 534 U.S. at 273). "However, reasonable suspicion unequivocally demands that the detaining officers must have a particularized and objective basis for suspecting the particular person stopped for criminal activity." *Id.* (citation omitted). "The ultimate question is whether the record is sufficient to establish that police had a reasonable suspicion based on articulated facts that would justify the [] seizure of the individual in question." *Id.* (citation omitted).

The testimony and evidence presented at the suppression hearing demonstrates that law enforcement had a reasonable, articulable suspicion when Davis exited the In and Out Service Station restroom that Defendant had engaged in criminal activity. At the time that officers arrived at the In and Out Service Station, the officers were aware of a report of a home invasion. (Hr'g Tr. at 7-8). The home invasion was allegedly perpetrated by three armed black men wearing black. *Id.* at 8-9, 47. It was also reported that the alleged perpetrators of the attack had left O'Dea's property in his yellow Jeep Wrangler—which had a soft top and a damaged windshield. *Id.* at 9. The officers arrived at the In and Out Service Station in response to an officer's report of a yellow Jeep Wrangler with a soft top and a damaged windshield at the scene. *Id.* Officers Joseph and Cedano found a yellow Jeep Wrangler with a soft top and a damaged windshield in the parking lot next to

the In and Out Service Station. *Id.* at 10. After observing the vehicle, the officers encountered two

men inside the In and Out Service Station. *Id.* at 13. The gas station attendant reported to Officer

Joseph that three men wearing black clothing had entered the In and Out Service Station; that one

of the men entered the service station with a black backpack; that all three men "seemed worried"

or "nervous" when the officers arrived; and that one man took the backpack and entered the

restroom upon the officers' arrival. *Id.* at 13-14, 45. When Officer Joseph knocked on the door of

the restroom and instructed the occupant to come out, a man did, in fact, exit the restroom. Further,

Officer Joseph testified that the three men met the reported description of the alleged perpetrators

in that they were wearing dark clothing; were of the approximate reported height; and were

Hispanic/black males. *Id.* at 19. These facts, taken together, support the conclusion that law

enforcement had at least the requisite reasonable suspicion to conduct a brief investigative stop

when Defendant came out of the restroom. *See, e.g.*, *United States v. Encarnacion*, Case No. CR

2013-20, 2014 WL 463510, at *6 (D.V.I. Feb. 5, 2014) ("an officer stopping: (1) a silver Toyota

Corolla; (2) with a chrome gas tank cover; (3) on the road at 2:00 a.m. on the island of St. Croix;

(4) traveling in a direction consistent with its last sighting by a victim of the robbery; and

(5) matching the description broadcast over the police radio from victims of an armed robbery"—

was sufficient to establish reasonable, articulable suspicion that criminal activity was afoot).

Officers Joseph and Morales testified to more than an "inchoate and unparticularized suspicion or

hunch" that Defendant had engaged in criminal activity—the reported home invasion. *Terry*, 392

U.S. at 27.

Defendant argues to the contrary that the Government must establish that a crime had been

committed and present testimony regarding an officer's "personal knowledge of the report that led

to the home invasion radio broadcast" in order for the Court to find that there was reasonable suspicion to justify a *Terry* stop. (Dkt. No. 114 at 3). The Court disagrees.

In reaching the conclusion that reasonable suspicion existed, the Court notes that the police dispatcher received, and communicated over the radio, a report from the identified victim—Stephen O'Dea—of the home invasion and theft, describing the alleged perpetrators as three armed black males, "one slender, one 5/7, another possibly 5/11," wearing black clothing, and describing the stolen vehicle as a yellow Jeep with a soft top and cracked windshield. An identified victim's report is more reliable than a "tip," and will generally provide reasonable suspicion when the victim of a crime "seeks immediate police aid and gives a description of his assailant ... ." *See Adams*, 407 U.S. at 147; *United States v. Nelson*, 284 F.3d 472, 482 (3d Cir. 2002). Thus, the report lodged by the victim here can properly be used for purposes of assessing reasonable suspicion.

Defendant also argues that the description of the three men who allegedly committed the home invasion—three black males  wearing black clothing, one slender, one five feet seven inches, one possibly five feet eleven inches (Hr'g Tr. at 9, 38)—did not match the Defendants.  (Dkt. No. 114 at 5-6). Defendant maintains that he was wearing "blue jeans" and "[t]here was no testimony regarding the color of his shirt." *Id.* at 5. He further argues, based on the written police report, that two of the men arrested at the service station were "between the heights of 5'9" and 6' and one was between the heights of 5'3" and 5'6"." *Id.* at 5-6 (citing Hr'g Tr. at 38-39). Defendant's arguments do not alter the Court's conclusion.

First, contrary to Defendant's suggestion, there was in fact testimony on the record which supports the victim's report that the alleged perpetrators were wearing black clothing. Specifically, Officer Joseph testified that the gas station attendant reported that three men wearing black had

entered the In and Out Station and that one of the three—later identified as Davis—had gone into the restroom. Officer Joseph also testified that the three men "were wearing dark clothing." (Hr'g Tr. at 19). Defendant's claim that he was wearing "blue jeans" does not negate that testimony.

Further, Defendant's argument that there was some discrepancy of significance between the reported heights of the alleged perpetrators and the heights of the defendants as recorded on the police report is without merit. The Court considers inconsequential the purported differences between an estimated height of 5'7" as compared with 5'3"-5'6", and an estimated height of "possibly" 5'11" as compared with 5'9"-6'. Officer Joseph testified to having seen three men who were "Hispanic males/black males" and who were approximately the same height that was reported over the radio. (Hr'g Tr. at 19). The Court finds that the testimony elicited at the hearing establishes that the suspects essentially fit the description of the alleged perpetrators.

In the final analysis, the Court must consider all of the evidence, not "in isolation from each other," but, in combination to determine whether the "totality of the circumstances" supports reasonable suspicion. *Arvizu*, 534 U.S. at 274.  As discussed above, the description of the three men who allegedly committed the home invasion is one of the several factors upon which the Court relies to conclude that reasonable suspicion existed so as to justify the seizure of Davis for investigatory purposes at the point that he exited the In and Out Service Station restroom.

In the second step of the *Terry* analysis, the Court must consider whether the evidence shows that the interaction between the officers and Defendant was conducted in a manner that "was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19-20. Officers are "authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a *Terry*] stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985); *see Terry*, 392 U.S. at 23-24.

18

Here, the officers engaged in a brief interaction with Defendant which lasted no longer, and was no more intrusive, than necessary to effectuate the purpose of the stop. *See Royer*, 460 U.S. at 499. Officer Morales testified that the interaction took approximately two minutes. (Hr'g Tr. at 63). Officer Joseph knocked on the bathroom door and announced "that [they were police] officers, and to step out of the restroom." *Id.* at 48. When Defendant stepped out of the restroom, Officer Morales conducted a pat-down of Defendant for officer safety. Officer Joseph asked Defendant if he operated the vehicle outside of the service station. Officer Joseph then searched the restroom and found a backpack. He asked Defendant if the backpack was his and when Defendant told him it was not, Officer Joseph opened the bag and reported to Officer Morales that there was a gun inside. Then Officer Morales escorted Defendant out of the service station.

Thus, the officers' actions during the brief interaction with Defendant were reasonably focused on their safety in response to an alleged home invasion by armed men, and on confirming or dispelling their suspicions as to Defendant's involvement in the home invasion. The Court finds that the officers' actions were reasonably related in scope to the investigation at issue; and that the stop was no longer than necessary to investigate and not "excessively intrusive in its scope or manner of execution." *Johnson*, 592 F.3d at 451 (citations omitted).

In view of the foregoing, the Court finds that the interaction between Defendant and the police officers when he exited the restroom at the In and Out Service Station constituted a valid *Terry* stop. Accordingly, there was no violation of Defendant's Fourth Amendment rights as a result of that interaction.

### 2.   Search of Backpack

Defendant contends that Officer Joseph's search of the backpack discovered in the restroom falls outside the scope of a lawful search because he did not abandon his backpack.

According to Defendant, his negative response to Officer Joseph's question of whether the backpack was his was not sufficient to "establish abandonment by clear and unequivocal evidence." (Dkt. No. 114 at 2). The Government maintains, on the other hand, that it has provided sufficient evidence to establish abandonment by proving that Defendant "left his backpack in the public restroom after exiting and then denied ownership of it" and did not "take any steps to 'protect it' when" Officer Joseph began to search. (Dkt. No. 115 at 9).

"A *Terry* frisk is invalid . . . when it extends to a pat-down of a suspect's belongings." *United States v. Bennett*, 2010 WL 1427593, at *6 (E.D. Pa. Apr. 8, 2010). However, a suspect may forfeit the expectation of privacy with regard to their property by abandoning it, and thus waive the potential protection against searches. *See United States v. Fulani*, 368 F.3d 351, 354 (3d Cir. 2004) (citing *Abel v. United States*, 362 U.S. 217, 241 (1960)) (holding that a defendant forfeited his property interest in a bag through his denial of ownership). A suspect may abandon his property by indicating the property is not his in response to a direct question from law enforcement, even where the property is identified with his name. *Fulani*, 368 F.3d 351, 355 (3d Cir. 2004) (rejecting district court's ruling that once agents discovered defendant's name tag on bag disclaimed by defendant, they could no longer argue that the bag was abandoned).

Here, Officer Joseph found a black backpack in the restroom of the In and Out Service Station. (Hr'g Tr. at 16). Although Defendant was seen taking the backpack into the restroom by the gas station attendant, Defendant verbally denied ownership of the backpack in response to Officer Joseph asking if the bag belonged to him. *Id.* There is nothing on the record to indicate that Defendant attempted to protect his privacy right over the backpack in any way.[8] Therefore, the

---

[8] Defendant's contention that he "attempted to protect his private property from inspection by leaving it in the bathroom," (Dkt. No. 114 at 10), has no support in the record and is belied by Defendant's denial of ownership.

Court concludes that Defendant abandoned the backpack. Accordingly, the search of the backpack did not violate Defendant's Fourth Amendment rights.

### 3. *De Facto* Arrest

The Government concedes that Davis was subject to a *de facto* arrest when he was transported to the police station. The Court agrees. *See United States v. Wrensford*, 866 F.3d 76, 85 (3d Cir. 2017) (holding that defendant was subject to a *de facto* arrest when he was transported from the location where he was found to a police station) (collecting cases). The question then is whether the officers had probable cause to effectuate such an arrest. The Court answers this question in the affirmative.

The evidence here shows that the officers had probable cause to arrest Defendant at the point that he was handcuffed and transported to the Police Operations Building. In addition to the circumstances discussed above, the officers, by that point, had discovered the backpack in the restroom and observed that it contained the butt of a gun. This was of significance when added to the factors previously discussed because the alleged perpetrators of the home invasion were reported to be armed. Although Davis denied ownership of the backpack, the gas station attendant had reported to the officers that Davis entered the restroom with the backpack. The totality of the facts and circumstances known to the officers at the time Davis was handcuffed and transported to the police station was sufficient to warrant a belief by a reasonable person that Davis had participated in the home invasion. *See Orsatti*, 71 F.3d at 482.

Accordingly, the Court will deny Davis' request for the suppression of the evidence in this case based on his claim that the evidence was obtained as the result of an illegal arrest.

### B. Statements

Defendant argues that his *Miranda* rights were violated when he was interrogated by federal law enforcement at the police station, prior to his formal arrest. The Court disagrees. [9]

#### 1. Right to Remain Silent

Davis contends that he was subject to a custodial interrogation in violation of *Miranda* when Officer Joseph and Sgt. Ortiz questioned him at the Police Operations Building. (Dkt. Nos. 41 at 9-10; 114 at 12). In support of this argument, Davis asserts that—although the officers informed him of his *Miranda* rights before they questioned him—he refused to sign a *Miranda* waiver form that was presented. *Id.* at 4. Davis further contends that he "asserted his right not to answer questions," but that the officers nevertheless continued to question him. *Id.* at 12. Finally, Davis asserts that the statement he provided to the officers was involuntarily given, such that it must be suppressed. *Id.* at 11-12.

While the Government concedes that the officers' questioning of Davis at the Police Operations Building constituted a custodial interrogation, it argues that the interrogation was proper because the officers provided Davis with a copy of his *Miranda* rights and read his *Miranda* rights aloud; Davis indicated by his signature that he understood his *Miranda* rights; and Davis

---

[9] Defendant also contends that the statements made to police during the initial contact at the restroom required *Miranda* warnings and thus must be suppressed for violating Defendant's Fifth Amendment rights. (Dkt. Nos. 114 at 11-12; 116 at 4). However, as discussed above, the only questions asked of Defendant at that time were whether he was operating the Jeep and if he owned the backpack. Such questions fall within the scope of the investigative questioning permitted during a *Terry* stop. A valid *Terry* stop does not implicate Defendant's Fifth Amendment Rights. *See Shatzer,* 559 U.S. at 113; *see also United States v. Gonsalves*, No. 19-CR-0011, 2020 WL 1170217, at *4 (D.V.I. Mar. 10, 2020) ("Officers 'may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.'") (quoting *Berkemer*, 468 U.S. at 439). Thus, no *Miranda* warnings were required.

waived his rights by failing to "verbally or [un]equivocally express or exercise his right to remain silent" (Dkt. No. 43 at 8), and by participating in the interview (Dkt. No. 113 at 6-7). The Government further asserts that the totality of the circumstances demonstrates that Davis' statement to the officers was given voluntarily. (Dkt. No. 43 at 8).

An individual must "unambiguously" invoke his right to remain silent. *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010). Where an individual who fully understands his *Miranda* rights "acts in a manner inconsistent with their exercise," courts may presume that the individual "has made a deliberate choice to relinquish the protection those rights afford." *Id.* at 385. Accordingly, the question before the Court is whether Davis unambiguously invoked his right to remain silent or whether he knowingly, intelligently, and voluntarily relinquished his right to remain silent by making a statement to the officers after *Miranda* warnings were given. *See United States v. Huggins*, 392 F. App'x 50, 57 (3d Cir. 2010) ("[A] statement made during a custodial interrogation is "inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [*Miranda*] rights' when making the statement.") (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).

A defendant's refusal to sign a *Miranda* waiver form "does not preclude a finding of waiver, nor does it [necessarily] make further questioning a violation of [a] defendant's constitutional rights." *United States v. Filiberto*, 712 F. Supp. 482, 487 (E.D. Pa. 1989) (citations omitted); *see also McDonald v. Lucas*, 677 F.2d 518, 520 (5th Cir. 1982) (rejecting the position that a defendant's statements were "per se inadmissible solely because he declined to sign [a] *Miranda* form") (citing *Butler*, 441 U.S. at 373). "[While] an express written or oral statement of a waiver ... is usually strong proof of the validity of that waiver, [ ] [it] is not inevitably either necessary or sufficient to establish waiver." *Butler*, 441 U.S. at 373. In the Third Circuit, [a

23

suspect's] subsequent willingness to answer questions after acknowledging that [the suspect had been informed of and understood his] *Miranda* rights is sufficient to constitute an implied waiver[.]" *United States v. Velasquez*, 626 F.2d 314, 320 (3d Cir. 1980). Thus, "[t]he court must look to the totality of the circumstances to determine if the suspect's conduct manifests a 'knowing and intelligent relinquishment or abandonment of a known right or privilege.'" *United States v. Wesselhoft*, No. CR 2015-0036, 2016 WL 3212483, at *12 (D.V.I. Apr. 8, 2016) (citing *Johnson v. Zerbst,* 304 U.S. 458 (1938)).

In *United States v. Cruz*, the Third Circuit upheld the district court's decision to deny a motion to suppress a statement where neither defendant affirmatively waived his *Miranda* rights. 910 F.2d 1072 (3d Cir. 1990). A law enforcement officer testified that he recited the *Miranda* warnings to two defendants who both acknowledged that they understood their rights. *Id.* at 1079. The officer also testified that he asked them if they waived their rights prior to questioning and neither explicitly waived their rights. *Id.* at 1079-80. One defendant then asked the officer a question and, instead of answering, the officer started asking the defendant questions. *Id.* at 1080. There was no evidence that the defendant "indicated that he wished to remain silent on … any issue and there is no indication that he … hesitated before answering questions." *Id.* The Third Circuit determined that, as an affirmative *Miranda* waiver was not required, the circumstances supported a conclusion that defendant's responses were a voluntary waiver of his rights. *Id.*

Here, the testimony and evidence presented during the suppression hearing support the conclusion that Davis' decision to speak with the officers constituted a knowing, voluntary, and intelligent waiver of his right to remain silent despite his refusal to sign a *Miranda* waiver form. Before initiating questioning, Officer Joseph received confirmation from Defendant that he could read and understand English. Gov't Ex. 1 at 00:50-00:56. Officer Joseph then advised Defendant

24

of his *Miranda* rights from a form, which he provided to Defendant, and asked him to sign it to confirm he understood his rights. Gov't Ex. 1 at 00:57-02:15. Defendant signed the portion of the form indicating he understood his rights. *See id.*; Gov't Ex. 2. Then, Officer Joseph read him the waiver portion of the form and told him where to sign. Gov't Ex. 1 at 2:17-02:45. Defendant refused to sign the waiver, saying that he did not have any questions or anything to say. *See Berghuis*, 560 U.S. at 381. He then answered questions from the officers without any objection. Although Defendant refused to sign the waiver of rights portion of the form after it was read to him, he nonetheless immediately responded to the questions posed by the law enforcement officers. Gov't Ex. 1 at 02:41-03:10; *Wesselhoft*, 2016 WL 3212483, at *12 (noting that "[n]umerous courts in the Third Circuit . . . have opined that a defendant's refusal to sign the waiver form did not require a conclusion that there was no waiver") (collecting cases). Defendant makes no allegation that officers intimidated, coerced, or deceived him at any time during the interview, and the recording of the interview does not suggest otherwise. *See* Gov't Ex. 1. Further, as the recording of the interview confirms, at no point during the interview did the officers subject Davis to the type of intimidation, coercion or deception that would render his statement to the officers involuntary. *See generally* Gov't Ex. 1. Therefore, the Court finds that Defendant knowingly and voluntarily waived his Fifth Amendment rights, and that his statement was given voluntarily.

In view of the foregoing, the Court will deny Defendant's Motion to Suppress on Fifth Amendment grounds.

### 2. Right to Counsel

Defendant also argues that he was questioned "without a lawyer present *after* he refused to waive his right to have counsel present," and thus his statement must be suppressed. (Dkt. No. 41

at 10) (emphasis in original). In this regard, it is clear that "*Miranda* requires that a suspect be informed of the right to have counsel present during questioning." *United States v. Warren*, 642 F.3d 182, 184 (3d Cir. 2011). Accordingly, a suspect must be advised of his right to have counsel present prior to a custodial interrogation, and "[o]nly if there is a voluntary, knowing, and intelligent waiver of [that right] can police question a suspect without counsel being present and introduce at trial any statements made during the interrogation." *Alston*, 34 F.3d at 1242.

Although a suspect may validly waive his right to counsel through a knowing, intelligent, and voluntary response to interrogation after the provision of *Miranda* warnings, "additional safeguards are necessary when the accused asks for counsel[.]" *Edwards v. Arizona*, 451 U.S. 477, 484 (1981). "[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards*, 451 U.S. at 484. Instead, if the right to counsel is invoked, the interrogation must cease until an attorney is present, "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 485. However, a suspect's invocation of his right to counsel must be "unambiguous" and he "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994).

For the same reasons previously discussed in connection with Defendant's right to remain silent, the Court finds that Defendant voluntarily, knowingly, and intelligently waived his right to have counsel present. Further, it is clear from the recorded interview that Defendant never affirmatively invoked his right to counsel. "[A] refusal to *waive* rights . . . is not necessarily equivalent to an unambiguous decision to *invoke* them." *United States v. Plugh*, 648 F.3d 118, 125

(2d Cir. 2011); *see also Smith v. Illinois,* 469 U.S. 91, 98 (1984) (per curiam) ("Invocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together."). No evidence was presented that shows Davis unambiguously invoked his right to counsel or engaged in a "course of conduct such that the officers should reasonably have been put on notice that . . no further questioning could occur" in the absence of counsel. *Id.* at 126. Because Davis did *not* unambiguously invoke his right to counsel, the law enforcement officers were under no obligation to cease their questioning once questioning had commenced as a result of Defendant's knowing and voluntary waiver of his right to counsel.

Accordingly, because there was no violation of Defendant's right to counsel, the Court will deny the Motion to Suppress.

## IV.    CONCLUSION

For the reasons discussed above, the Court concludes that the Government has shown by a preponderance of the evidence that Defendant's Fourth Amendment rights were not violated because law enforcement had reasonable suspicion to conduct a *Terry* stop at the In and Out Service Station and probable cause to effectuate an arrest after the initial seizure. Further, the Court finds that Defendant knowingly and voluntarily waived his *Miranda* rights, and gave a statement voluntarily. Thus, there was no violation of his Fifth Amendment rights. Accordingly, the Court will deny Defendant's Motion to Suppress.

An appropriate Order accompanies this Memorandum Opinion.

Date:   July 6, 2020                                            _____/s/_____
                                                              WILMA A. LEWIS
                                                              Chief Judge

27